Good morning. May it please the court. My name is Daniel Johnson. I'm here for the appellant, Plaintiff Lenny Coulombe. And as the court surely knows, this is a case that raises several questions of Washington state wage law. A couple of questions. Sure. I've got the options. As I understand, you could have an option deal where when a person becomes an employee, the agreement with the employer is to pay him $100,000 a year plus stock options for 10,000 shares of stock per year. That could be the deal. But as I understand it in this case, that was not the deal. The deal is your pay is so many dollars, and then the stock options are awarded as a discretionary basis, like a discretionary bonus. Have I got that right? Yeah, sure. Sure. What was the deal? In other words, what would be the deal? There was no contractual arrangement whereby an employee would get a stock option. Yeah. Each year, though, in the three or four years preceding this rebate that is at issue here, Mr. Coulombe and others like many others like him in the company were awarded on a regular basis these stock options, and they came with rather lengthy contracts which set forth the rights of the parties and what Mr. Coulombe would be able to or would have to do to exercise those options. The contract is the contract as to how the stock options would be exercised. There was nothing in the employment agreement that said you will receive as part of your compensation every other year stock options pursuant to a certain formula or anything of that sort. No, there was no employment agreement, in fact. But that is really a side issue that I think has been raised in the context of this Berne case. I don't know if it's a side issue. You've got a Washington Supreme Court case, as I recall, Carter, that says if they're voluntary, then the anti-kickback law does not apply. So it seems like it's a central issue, and I don't understand exactly what your argument is for getting rid of Carter. Your Honor, you're right. That's a central issue. But I think this is a completely different issue than whether or not there was a contractual obligation originally, prior to the rebate, concerning these stock options. No, I think they're in dis- well, maybe you're understanding it differently from me, but I thought we're focusing on the same thing. Is there a contract to give him the stock options? If yes, then maybe the anti-kickback law applies. If no, then under Carter, it's voluntary, so the anti-kickback law does not apply. No, I would approach it completely differently, Your Honor. Let me try to explain. The stock options were something that Mr. Coulomb and the other employees there did own. They were given to them, and they were given to them as part of their compensation for that year's work. That is absolutely an undisputed fact. Sure, but whether it was the asset was in the form of a stock option or in the form of cash, it was then his to do with what he wanted to do. And as in Carter, he said, okay, I'm going to give them back. Right. So to Judge Hurley's point, these were clearly something that he owned in the form of compensation, and that, I think, answers Judge Hurley's question. Well, it's not that. That's two different questions. I mean, if there's no employment agreement to stock options, arguably the stock option is therefore not even a quote, unquote, wage.  And that's the question I think that Judge Hurley's question is going to be. I think that was his question. I think Judge Kleinfeld and my question is a different one. Was it a rebate? Was it a rebate? Yes, exactly. Right. Which is, regardless of whether you put aside the ---- I want to answer both those questions. Yes. Very badly. So which one should I start with? Answer both of them. We'll try to be quiet. Conceptually, it helps me to talk up to address the first question first, which is, was this a wage? And the answer there, I think, is found. The Court has to look to what the Washington Supreme Court would do in answer to that question. And I think it's very clear because the courts in Washington have said that, unlike in California and some other states, wages are any form of compensation. It could even be a television set. In Byrne, they said that the television set that was a discretionary bonus was not a wage. Well, right. They said it was not a wage for a complete ---- Television sets every year as a matter of part of their deal. Which is a different reason. That's a reason that doesn't apply in this case. But whether an object that is not money, like salary or a regular wage, which everybody agrees is a wage, whether that object could be a wage, the Court answered yes. Then it turned and said, but in this case it's not because the employer never gave it to you. He got it from an auction house, a third party. So how can you rebate something that, you know, how can you get a rebate of something you never gave in the first place? They said that the television was a bonus rather than a wage. They didn't say it comes from somebody else, not your employer. Well, they analyzed ---- because I think Mr. Byrne raised this sort of as an alternative argument. Well, it's like a bonus. It's like a bonus that I got from my employer. They analyzed the case law on bonuses. And they said the television was at most a discretionary bonus. It was not due him under an implied contract. But the point there is ---- So they said that in order to be considered compensation, it has to create an implied contract. Otherwise, it's a mere gratuity. Right. But the point there is if somebody is claiming a right to an item of compensation that they have not yet received, they are only due that compensation if it is regularly given, if it's completely discretionary. So say I work at a car dealership. I'm expecting a bonus at the end of the year in December, and I get fired in October. And I say, well, give me my December bonus. The car dealership says no. The courts in Washington will resolve that question the way Byrne discussed it here. Was it regularly given, thus creating an implied contract, or was it discretionary? Thus, you didn't earn it yet. You have to be there in December. That question is not presented here. He had his stock options. They were considered by the employer as wages. They had been given to him as a form of compensation, which they themselves said was interchangeable with salary. So the question is whether how do you ñ what's the reference point to define wages? Is it the employer's position, or is it a wage within the purview of this criminal statute where it has a criminal aspect to it? Well, what the Washington courts have done ñ I think it's fairly clear that as far as the employer was concerned, DeVita, their position was, and they promulgated this in various publications and items that were disseminated to employees, you're going to be paid through ñ you're going to get a paycheck, you're going to get bonuses, and you're going to get stock options. Stock options are an important part of the wage component that you will receive. So clearly, I think, at least an argument can be made that this clearly was compensation. The stock options were compensation. Now, as you know, our job is to determine whether, under Washington law, the stock options were wages for purposes of 050. And Byrne answers that question. Another case we cited from the Supreme Court. Byrne tells you that a TV set can be a wage. Right. If it was compensation for labor performed. Well, they say in part. But I think the main thing that the Byrne court says is if you have a repetitive type of practice, you get this on a regular basis, it will become basically a wage. That's why I think they drew the analogy to the bonus type of situation. Well, again, I think that's eliding the issue that's actually at stake in this case. Rather than belabor it, because I tried, maybe it would be helpful to look at the Heil case, H-I-S-L-E. It's cited at footnote four in our opening brief. It discusses Byrne in the context of a broader context. And the definition of wages under Washington law, unlike California and some other states, is any compensation due by reason of employment. But 050, which is the anti-kickback statute, that actually doesn't have a definition of wages. Right. And so these cases have said that under that statute, we're going to define wages expressed in that statute by looking at other statutes. So let me just say to me it doesn't make much difference whether it is or isn't a wage. I don't much care for purposes of my question. Because my question is, even so and regardless, the statute does not forbid contributions back to the employer. In here, you had requests to relinquish options. Cologne signed the November, I think it was, 2000 letter. He declined the opportunity in December to relinquish the relinquishment. And he testified that he knew there was no promise associated with it except to be a team player, which it's certainly not. I mean, that's just a voluntary thing. You want to be a team player. So I don't understand why we even bring our hands about wages, whether it's wages or not. That's actually interesting. I agree. I think the question here really boils down to whether this was a rebate. And the district court never answered that question, although that was the very first question. It's harder to answer it as a matter of law. Exactly. Because of McDonald. McDonald versus Walker. The issue wasn't presented there. And they didn't answer it. Well, let's start at the statute. The statute plainly does apply, even in the context of a voluntary contribution. Carter is a gloss on the statute. The statute does not read, does not say anything about the employee's state of mind. Carter would bear on a case where somebody works for Greenpeace. They work for Greenpeace because they're ardent environmentalists and they get $150,000 a year because of all the foundation money that goes to Greenpeace and they feel that that's just wrong because they care so much about the environment. So they make a $1,000 contribution to Greenpeace. Under your analysis, that's a violation of the anti-kickback law. Under Carter, as I understand it, it's okay. No, I agree with you, Your Honor. Carter is a very unique case. It's like a Greenpeace case. It's a charitable gift case where ---- It doesn't say so. It says it explicitly that it works for private as well as political. Well, but it also says that ---- I mean, just stepping back, one has to agree that the statute itself, which is supposed to be liberally construed and always is by the State courts, statute itself has nothing about the employee's state of mind. So what Carter did is it dealt with a very strange situation and essentially said, well, we're not going to call this a rebate because it doesn't look like one to us. Well, what's strange about it is the company says, look, things have gone to hell in a handbasket and your stock options are not worth anything basically to you right now because you pay a lot more for them than they're worth. You can help us just like you could help Greenpeace or you can help the candidate running for office by returning them to us if you want to. But you don't got to. You make your own decision about their ---- about what's important to you. And Colon affirmed that he would do it. He, given another chance, said, yeah, that's fine, I don't want them back, and testified that he did it voluntarily. What's really the substantive difference? Well, the first one is that it was ---- you know, in this case, the employer didn't even know that the money was being collected, certainly didn't ask for it. It was a gift to an individual political elected official. It seems much more like what the anti-kickback law is directed at than your case. I mean, we discussed what it's directed at in the Bajoruk case, IBM versus Bajoruk, and it's during the Depression in order to get a government job where your paycheck didn't bounce, you often had to kick back part of the money to the party. Well, that's one of the social evils the anti-kickback laws are directed against. There's federal law directed against it, too. It's just right on the button in terms of purpose of the law. Your case seems more like what the rhetoric of Carter fits. It seems more like Byrne, and it seems more like what we discussed in the Bajoruk case. Well, I think, Carter, again, I think it's a very different case than I think McDonald versus Walker is. I know it's different, but it seems to me it's different in the sense that your case is a fortiori rather than different in the sense that it's distinguishable. It's different in that that looks a lot more like a kickback than this does. What am I missing? I think it looks a lot less like a kickback because the guy who received the alleged kickback in that case, again, he didn't ask for it. He didn't know about it. And while there may have been a sinister motive, it apparently was tried the other way and concluded that there was no evidence supporting any sort of coercion or pressure. And in this case, going to Judge Reimer's point, there is evidence that there was coercion and pressure, and that's a factual issue that can't be resolved on summary judgment against the nonmoving party. Could any reasonable trier of fact conclude that there was some type of coercion, where the witness said on a number of occasions, I did this voluntarily, I wasn't pressured. When I went to the airport, there wasn't pressure. My boss told me to basically make a decision. I mean, yes, there's some allusions that he mentions about team player, and I was concerned about that. Also, there was the statement supposedly made by, I forget his name, Corr, and it begins with a K, the boss that met him at the Los Angeles airport. And he said, well, you know, if you're not a team player, who knows. But that's true. But Mr. Klum knew that, and yet he categorized his state of mind, and he's the best, obviously, person to testify about his state of mind. He did it voluntarily. I didn't feel pressured. But, Judge Hurley, he didn't say that. He answered questions. Isn't it true that you weren't forced to do this? He answered those in the affirmative. He was an honest witness. But he also stated in his deposition testimony that he felt that he should do this for the team and that he might lose his job if he didn't. And, you know, even Carter recognizes that. I'm sure you know the record better than I do. From what I have read, though, that didn't seem to be the tenor of his testimony. Well, you may say, well, that's an issue of fact. But sometimes an issue of fact becomes an issue of law because no reasonable person could grab onto those tidbits and somehow claim it overrides his conclusory statements. No pressure. The fact he had two weeks to think about it, the fact that he gets a letter later and says, look, all of them did. You know, we don't want to put any pressure on you guys. If you want to rescind giving us back the shock options, so be it. Yeah, I just – the case is dead on all fours with McDonnell versus Wachter in our view because in that case you have a private employer that came to him and said, I want some of your wages back, and he agreed to it and later changed his mind. No, that's not exactly what he said. What he said was the employer said to him, the car dealer, he said, if you want to be assured of continuous employment, he didn't say you could be fired, but he said, you know, if you want to be one of the guys assured of continuous employment, what you do is we'll give you $350 a week, you're going to get a commission that will exceed that, and under the collective bargaining agreement you could keep it. But I suggest you give it back to me. That really is arm-twisting, I think. I don't think there was any arm-twisting here. And, you know, we also know, and I know it's a mere aside, but your client received $664,000 in exercising these other options, some of which I assume had an escalated value because of the program which called for the – That assumption has no record evidence in support of it. Okay. And I understand the – It's an aside. I agree. No, it is. I agree it's an aside, but he's part of a process. He joined in the process. He made the decision. Seems like he made it voluntarily. But knowing the practical reality of a private at-will employment, a good job that you have that you want to keep and you're asked to do something by your boss, nine employees out of ten are going to do it whether they like it or not. I mean, a number of people didn't. Yeah, I think it was seven out of ten, you know. And, you know, keep in mind, this was something that Mr. Kulam and everybody else knew. If they decided not to, it would be potentially very valuable. They had years to exercise it. This is not something that, well, it's worth nothing anyway, you know. I don't care. How much was it worth at the time they surrendered? It was like – In 2000, it was $2.56 a share. $2.56 a share. No, at the time it went up. It was up to about $8. Yeah, it was up to $8 or $10 or something more. And, you know, sure, they were underwater, but everybody expected and hoped that it would go up. And there's only – you know, a practical – a self-interested employee would keep them if he didn't feel pressured to not keep them. But, again, our position is that that's not a question under the statute. If it were, you would never have a violation of that portion of the kickback statute, because you can't ever give money back without, you know, some kind of voluntary action. And I guess I would ask – Didn't the court in McDonald distinguish harder by saying that there was no contention in McDonald that voluntary contributions were given instead that the employer said no sum had been rebated? Right, but that's right. In the passage – I see the passage here. That's exactly right, but I think it's been misread by the other side, because if you're the judge, the justice is in Walkner, McDonald v. Walkner, and you're looking at Carter and you're saying that case doesn't apply, and yet you have a guy here who walked into his employer's office every week and gave him money, you know, then you must not be interpreting Carter as meaning any time that it's voluntary, there's no claim. I mean, at the very least, you must be assuming that Carter sets up a factual question of voluntariness, even though it's not in the statute. It's not in the plain language of the statute, which is supposed to be liberally construed. You must be assuming that, which is, in fact, what Carter ends up saying. There will be some circumstances when there is some form of coercion of duress. And so I think, at the very least, summary judgment has to be reversed on that ground. Although, again, I think the Washington courts would say that there is no state-of-mind element to Section 050 to a rebate on the part of the employee. And I would ask that the Court certify it to the Washington courts, as it did, this Court did in under the similar cases to the Idaho Supreme Court, for example. Okay. Mr. Johnson, your time has expired. It certainly is, and I appreciate your indulgence. Thank you. Mr. Sanders. Good morning, Your Honors. James Sanders for Respondent Eda. May it please the Court. I'll pause my prepared comments for a moment and pick up, I think, where you sort of left off towards the end of the question. Because, to me, the question about whether or not what happened here qualifies as a criminal rebate under the Washington statute really is answered by the two cases that interpreted the statute in the years right after it was enacted. Because that's really about it. There's, I think, four cases that actually look at this anti-kickback statute and interpret it, and there's two from the Supreme Court at the time it was enacted. Now, what Carter stands for, I think, primarily is the idea that exactly the opposite of what Mr. Klum is asking you to decide here is, look, everything an employee gives to his employer is not going to be a criminal rebate. And that's the rule that they really are asking you to adopt here. And Carter says, without question, that is not the rule. That is not what matters. And the difference is, look, everything an employee gives is not going to qualify as a criminal kickback. And it's as simple as that. Carter stands for that proposition. Wachner affirms the voluntary aspect of that. But Wachner also gives you the illustration of the type of thing the Court thought was a criminal kickback at the time. Because what happens, there is a criminal kickback. And it's the classic example. The employee has a union contract that gives him the right to a higher wage. And he enters into a secret side deal with the employer to kick back part of that union contract wage and get some smaller amount. That is exactly the sweet spot of what this statute was enacted to remedy. Now, look, none of us are back there in 1939. We don't know what was in the minds of the legislatures when they enacted this statute. But I think there's one thing that we can all be 100 percent sure of. Not one of them was thinking about stock options. And not one of them was thinking about the situation in the 1990s and early 2000s that was faced by DaVita and by a lot of other companies. Now, stock options are relatively new, but they're a good thing. They allow employees that work for these companies to share in the success of the overall venture. Not to just get the dollar for their wage or their hour at the time, but to put in their stakes as an owner, as a chance to share. If the value of the company rises, they get to share it as well. Now, Mr. Kalum had stock options. And he had the bad misfortune to have them all be granted in the 1990s when there was a huge run-up on the stock. So his shares, even after adjusting for splits, had strike prices of $32 and $18 a share. And the market value of the stock at this time was under $3 a share. So DaVita at that point has major problems. Obviously, first of all, you've got major problems if your stock's at $2 a share. There's a lot of people telling you, we don't believe in your company right now. But you've also got problems if you're a company that thinks your people is what makes you what you are and what drives your success, and you've got a bunch of people sitting on stock options that are priced at $32 and $18 a share, and you know every one of them is looking at the market price every morning when they go to work. You've got a problem if those people are going to think about leaving and go to a new job, a new job where their new company will give them stock options at a price that's the current market price, not one that's 16 times the current market price. And so what DaVita does in that circumstance is it takes every option it has left in the employee pool and gives it out to its employees at the $2 and some cents a share, and Mr. Kulum benefits significantly, gets 20,000 shares out of it. So all of a sudden, he's protected again. At least his option is at the price now. It's at the market price, not 16 times or 9 times the market price. But what happens then? Well, companies can't just print more options. You've got to get permission from shareholders to expand an employee option pool and get another set of options for the employees. And what the management wanted to do here was get 2.75. They actually wanted to get more than that, but they asked the board for permission to get a big chunk of options added to the pool for the employees. And the board said, okay, we'll go to the shareholders, and we'll get approval for that, but the employees have got to buy in here too. We've got to all work together. And so the employees that have what we're going to call wooden options, way out-of-the-money options, options that are well-priced above the market, let's ask them to give those back and return it to the pool. And so they set up this voluntary program. You read the communications that CEO Mr. Thierry sent out to the crew. They were as clear as possible could be. And at one point he says, please do not turn them in if you are going to feel angry. We have straightforwardly described reality. We have told you the agreement we negotiated with the board of directors. It is true that the stock could go up enough to put the wooden back in the money. And this next part is emphasized with underline. We do not want anyone complaining about a wooden turn-in if that happens. Employees knew what they were doing. Look, some of them said, I'm a team player. I'm going to give back my options that are way out-of-the-money. Some of them said, you know, I'm going to hold my options. Mr. Calhoun, to his credit, was one of the ones that pulled in for the team. And that did happen. I mean, we don't have to sit here and see it in the record because it's not something you can probably ever prove with evidence. But the company stabilized after that, and its stock went straight up. And it's a company that's studied in business schools for how successful they are. And everybody benefited. The rising tide lifted every boat. Mr. Calhoun benefited to the tune of $660,000. All right, now let me just turn real quickly to one issue. We can just look at the anti-kickback statute and setting aside the question of its intent and just look at the plain language, okay? Any employer who shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee shall be guilty of a misdemeanor. That's a criminal statute, first of all. But there isn't a single part of that grammatical construction of the sentence that makes sense in the context of an employee stock option. It's not something that is paid to anybody by any reasonable definition. It's something that's granted. But it's not even a tangible thing. It's not even like a stock share. I mean, you could presumably pay somebody in a stock share. But a stock option is not even that. It's just a contractual right to do something in the future, to buy shares at a certain pre-designated price. Well, because one of the problems with saying that, in effect, as a matter of law here in this case, is that the company in a number of its communications characterized the stock options as compensation itself. And it was considered part of the employer's compensation, total compensation. You can't pick up a newspaper nowadays and read about executive compensation and not have stock options be one of the issues. It is a way that an employer or an executive makes money off of their job. There's no question about that. But that doesn't ‑‑ I don't think that decides the issue, whether or not it's considered compensation. I think what you're saying, if I understand it right, is there's a set of things that are compensation, and there's a subset of compensation that are things that are wages. Have I got that right? Certainly that's true. And there's also, I think, a subset of compensation that can actually be rebated in any meaningful sense of the word. And a contract right really can't be rebated. It's not something you take part of and give back. I mean, it's a right that's just canceled in this case. It isn't really rebated in the sense that the normal language of the word would mean. But also, likewise, it's not a wage under Washington law. And this is really a separate analysis, but it's a correct analysis, and it's analysis from a decision that Mr. Breskin, counsel for Mr. Klum, was one of the parties on. That's the Byrne v. Courtesy Ford. And Byrne is absolutely clear. You look at the nature of something to decide whether it's a wage. You look at it, what happens at the initial transaction? Now, in this case, the TV goes to the employee. His boss says, hey, that belongs to the company. You give it to me or I'm going to fire you. And the employee says no, they fire him. The employee says, look, that's a violation of the wage rebate statute. I got a wage. He wanted me to give it back, and he did. And I didn't, so he fired me. And so what the court said is, look, it's not a wage if it's given at the discretion of the company, period. And the facts were undisputed here. These stock options were given at the discretion of the company. Now, had they been given so regularly they could have amounted to an implied contract, we might have a different case here. But the evidence was undisputed that for the last five years that Mr. Kloon worked here, he was not given any stock options. So it was clearly within the company's discretion to decide whether or not or how many options to give to people each year. So it was in the nomenclature of Byrne, which I think the Court has to look at as a pretty good indication of how the Washington Supreme Court would decide this issue, it was something that was purely discretionary, therefore more like a discretionary bonus, does not qualify as a wage under the statute. Is the answer, your opponent said that because they were given for, I think, three years, they were regularly given. Well, if they were given for three years, they were given twice in 97, once in 98, and once in early 99, it would be our position that that would not be enough under Washington law by a far stretch to amount to an implied contract that you're going to get stock options. Twice in 97? Once in 98. I think there were three different grants. 98 and when was the next one? The next one was in 99, I think. Once in 99, all at the same time of year? Well, the first two, I think, were at different times. And I think the third one was at the time of the normal compensation system. But again, after that, five years in a row, no stock options. If you're going to find that there was an implied right to get them every year, the evidence would have to be much stronger, I think, in this case, than it is right now. When they're returned, I think you mentioned this, but it's somewhat of an unusual circumstance when you think of rebating wages. Here, when the stock options are surrendered by the employees, they're canceled. They don't exist. Is that right? That is right. How do we issue them? Well, actually, you've put your finger on it, which I think is a very important element here that, again, designates this is not something that's a rebate. What happens is the way options work in general, and I believe the way they worked here is you have an employee option pool where you've got a set number of shares that are designated for the employees. And then you can draw from that and give certain employees contractual rights to a number of those shares. You've always got to account for it and make sure you've got enough there. But it's always in flux because employees quit or they're fired, and if the stock option is underwater at the time, the option expires after 90 days. I thought it was a 10-year option, so it's kind of like a 10-year call. Is it a 10-year exercise? In this case, this may be a 10-year exercise in this case. But I was thinking it's kind of like if it's underwater, it's kind of like a lottery ticket, a lottery ticket for a $1,000 lottery. You wouldn't pay $1,000 for it, but you'd pay $2. Yeah, it might be worth something. You could buy a call. You could buy a call for higher than the price of the stock. Right. No, I think that's right. You've got certainly – I mean, everything can be monetized to some degree, as we're seeing right now. But the point, too, though, is – It still exists, though. In other words, the option actually doesn't still exist. It doesn't exist. No. It's gone. It's gone. But what you have, then, is you've got shares. Okay. So it wouldn't be added to the – like, for instance, when the board of directors went to the shareholders to get approval for additional stock options to be issued, the ones that were surrendered by the employees wouldn't be added to the sum total that the board of directors and shareholders approved? What they are is they're not really added to anything, but they're freed up in the sense that – You give everybody options. You have an option for $10,000. You have an option for $10,000. Pretty soon it's more than the shares you have. They can't – More shares. You have to dilute your shares so the shareholders get to say no. Well, they can't actually do that. They can never have option contracts out for more shares than they've set aside in this pool for employees. So these shares are there. Nobody really owns them at a time. They're set aside as a reserve. It's for employees to have their options if they exercise their options. And the point I wanted to make is that one of the other reasons that makes this not – I thought it was like a call so that if the company could have the shares or not, and if it doesn't have the shares, no problem. It has to buy them on the market and give them to the employee. I don't know if that's how it worked in this case. I don't know either. I know that the concern that management had when they asked for more shares to be put into the employee pool was that they were not going to be able to grant new shares to people if they didn't have them set aside for that purpose. And the options that are canceled do go back into that pool in the sense that now you've got shares that before had been pledged to Mr. Kalum if he ever wanted to buy them at any given time that now can be pledged to some other employer, to Mr. Kalum again, if he had gotten additional options in the future. The point I wanted to make, though, why it's not a rebate, is the company doesn't get the shares back. The shares go back into a pool designated for the employees. It just went from Mr. Kalum to a pool reserved for employees. The company didn't get those shares. Unless there's any other questions. Did you have questions about any of the common law claims? I don't think there are any other questions. Do you have any other questions for Johnson? Okay. Then thank you, counsel, both of you, for your argument. The matter just argued will be submitted, and the court will stand at recess for the day.
judges: Rymer, Kleinfeld, Hurley